THE BOARD OF EDUCATION OF THE POUGHKEEPSIE CITY SCHOOL DISTRICT, Plaintiff,

v.

Daniel O'SHEA and Mallory O'Shea, individually and as the parents of Shannon O., a minor, Defendants.

No. 04CIV.2585WCC.

United States District Court, S.D. New York.

Jan. 18, 2005.

Shaw & Perelson, L.L.P., Attorneys for Plaintiff, Highland, NY, Mark C. Rushfield, Esq., Of Counsel.

Family Advocates, Inc., Attorneys for Defendants, Kingston, NY, Rosalee Charpentier, Esq., Of Counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff, the Board of Education of the Poughkeepsie City School District (the "District"), brings this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.*, against defendants D.O. and M.O. (the "Parents") on behalf of S.O., their minor child, to challenge a decision of a State Review Officer ("SRO") at the New York State Education Department's Office of State Review (the "Office of State Review"), which annulled a decision of an impartial hearing officer ("IHO") and ordered that the District reimburse defendants for the cost of S.O.'s tuition at a private school for the 2001–02 school year.[1] Plaintiff now moves for judgment on the administrative record and an order vacating the decision and order of the SRO in

Case No. 03–052. For the reasons set forth below, plaintiff's motion is denied.

## BACKGROUND

This case involves two separate impartial hearings and the subsequent SRO review of the decisions reached in those hearings. The first hearing was argued before hearing officer Sienko (the "Sienko hearing") and resulted in SRO Decision No. 02–101 (the "first SRO decision" or the "December 10, 2003 decision"). The second hearing was argued before hearing officer Wanderman (the "Wanderman hearing") and resulted in SRO Decision No. 03–052, which plaintiff now appeals. The following factual background is gleaned from the administrative record and the first and second SRO decisions, both of which were unappealed as to facts.[2] At the time of the Wanderman hearing, S.O. was a twelve-year-old seventh-grade student at the Kildonan School ("Kildonan"), a private school for students with dyslexia. (SRO Dec. No. 03–052 at 1.) S.O. was classified as speech impaired in kindergarten during the 1995–96 school year, and she remained so classified throughout the first and second grades. (SRO Dec. No. 02–101 at 2.) On March 30, 1998, after S.O. made progress in speech therapy and improved in math and spelling, the Committee on Special Education (the "CSE") adopted the school psychologist's recommendation to declassify S.O. and she was subsequently declassified. (*Id.*) S.O. remained declassified and in regular education classes with continued occupational

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i).

2. The administrative record consists of the transcripts of the Wanderman hearing, the exhibits from those proceedings and newly submitted evidence. The newly submitted evidence includes hearing officer Sienko's decision (attached as Exhibit A to defendants'

Answer to Pl. Mot. for Judgmt.) and the resulting decision of the SRO in Case No. 02–101 (attached as Exhibit A to Pl. Mem. Supp. Judgmt. Upon Admin. Rec.) involving the same parties and defendants' claim for tuition reimbursement therein. All references or citations to the hearing transcript herein refer to the transcript of the Wanderman hearing.

therapy and test modifications for the third-grade. (*Id.*)

S.O.'s third-grade teacher noted that her reading skills were above grade level, but that she was easily distracted and was overwhelmed by ordinary writing assignments. (*Id.*) At some point during S.O.'s third-grade year, her Parents brought her to a child study team who conducted more tests and eventually referred her to the CSE in May of 1999. (*Id.*) S.O.'s parents signed a consent for an initial evaluation. (*Id.*) On the Wechsler Individual Achievement Test, S.O.'s standard scores were in the average range except for written expression. (*Id.*) Additionally, the examiner noted that she was easily distracted. (*Id.*)

When the CSE met on August 25, 1999, it adopted the school psychologist's recommendation that S.O. be re-classified as learning disabled. (*Id.*) The CSE then developed an individualized education program ("IEP") for S.O.'s fourth-grade year. (*Id.*) The Parents signed the CSE's recommendation and added a note that it could be changed if they later disagreed with it. (*Id.*) On September 2, 1999, the Parents sent a letter notifying the District of their dissatisfaction with the 1999–2000 IEP and their intention to place S.O. in the fourth-grade class at Kildonan. (*Id.*) The Parents also requested tuition expenses, claiming that S.O. would need two to three years of private schooling. (*Id.*) In May of 2000, at the end of S.O.'s first year at Kildonan, her mother contacted the CSE about holding an annual review to develop a program for S.O.'s fifth-grade year. (*Id.*) She testified that she was told S.O.'s file was inactive and that a CSE meeting was not necessary. (*Id.*) The record confirms that S.O.'s file had been deactivated after she was placed at Kildonan. No IEP was developed for S.O.'s fifth-grade year. (*Id.*) By letter dated August 30, 2000, the Parents

notified the District of their intent to keep S.O. at Kildonan and again requested tuition reimbursement. (*Id.* at 2–3.)

An independent neuropsychological evaluation conducted in February 2001 showed a significant discrepancy between S.O.'s verbal and performance IQ scores. (*Id.* at 3.) The evaluator noted that S.O. was taking Adderal for attention deficit disorder and concluded that S.O.'s learning patterns fit the classic pattern of dyslexia and mild dysgraphia. (*Id.*) The evaluator recommended that S.O. be placed in a small, structured classroom with a systematic multi-sensory approach to learning and also that the program should include peers of at least average intelligence with no emotional or behavioral deficits. (*Id.*)

By letter dated June 19, 2001, the Parents requested an impartial hearing seeking a review of both the 1999–2000 and 2000–01 IEPs and tuition reimbursement for both school years at Kildonan. (*Id.*) At the Parents' request, the CSE met on August 16, 2001 to develop an IEP for S.O.'s sixth-grade year. (*Id.*) S.O.'s subsequent achievement testing revealed average to above average scores in both reading and writing, and the CSE recommended regular education classes and resource room one period a day with test modifications. (*Id.* at 4.) The minutes of the August 16, 2001 meeting indicate that the Parents maintained that S.O. required a full-day program tailored for students with dyslexia. (*Id.*) By letter dated August 16, 2001, the Parents informed the District that they would be enrolling S.O. at Kildonan effective September 11, 2001 and requested tuition reimbursement. (*Id.*)

The first hearing took place between November 20, 2001 and July 29, 2002. On September 22, 2002, more than one month

from the statutorily mandated due date,[3] hearing officer Sienko found that the District's 1999–2000 and 2000–01 IEPs were void because neither complied with IDEA procedural requirements. (*Id.*) Hearing officer Sienko awarded the Parents tuition reimbursement for both the 1999–2000 and 2000–01 school years, finding that the program at Kildonan was appropriate for S.O. and that the equities supported the Parents' claim. (*Id.*) He declined to consider reimbursement for the 2001–02 school year because the Parents had not requested an impartial hearing for that year. (*Id.*) On August 26, 2002, before the first IHO decision was rendered, the Parents sent two letters to the District. (SRO Dec. No. 03–052 at 2.) The first letter notified the District of their dissatisfaction with the 2002–03 IEP, their intention to keep S.O. enrolled at Kildonan and requested tuition reimbursement for the 2002–03 school year. (*Id.*) The second letter requested an impartial hearing to review the 2002–03 IEP. (*Id.*)

The District appealed hearing officer Sienko's decision with respect to the 1999–2000 and 2000–01 school years to the Office of State Review on the basis that equitable considerations did not support the Parents' claim for tuition reimbursement because, according to the District, the Parents did not properly inform the District of their intention to enroll S.O at Kildonan nor did they fully cooperate with the CSE. (SRO Dec. No. 02–101 at 4.) The District also argued that the Parents'

claims for both years should be barred by the equitable doctrine of laches. (*Id.*)

On October 3, 2002, the Parents requested an impartial hearing to review the 2001–02 IEP and, as a result of the first hearing officer's decision, asked the second hearing officer, hearing officer Wanderman, to consolidate the 2001–02 school year with their pending request regarding the 2002–03 school year. (SRO Dec. No. 03–052 at 2.) The District did not object to the Parents' request and hearing officer Wanderman accepted jurisdiction over both years. (*Id.*) The District partially settled the second hearing request by agreeing to reimburse the Parents for the 2002–03 school year, leaving 2001–02 as the only year at issue before hearing officer Wanderman. (*Id.*; Hr'g Tr. at 9–13.)

In an interim decision on December 7, 2002, hearing officer Wanderman determined that S.O.'s proper placement for the 2001–02 school year was the District's recommended program. (SRO Dec. No. 03–052 at 2.) In a final decision dated April 24, 2003, hearing officer Wanderman denied tuition reimbursement for 2001–02 after concluding that there was insufficient evidence of S.O.'s progress at Kildonan. (*Id.*) The Parents subsequently appealed hearing officer Wanderman's decision to the Office of State Review.

On December 10, 2003, more than one year after the statutorily-mandated due date, the SRO rendered his decision on the first appeal.[4] In Decision No. 02–101, the

---

3. Pursuant to N.Y.C.R.R. § 200.5(i)(4), an IHO is required to render a final decision no more than forty-five days after receipt of a request for a hearing or after the hearing has commenced. However, in cases where extensions of time have been granted, the decision must be rendered no more than fourteen days from the date the IHO closes the record. *See* N.Y. COMP. CODES R. & REGS. tit. 8, § 200.5(i)(4). Accordingly, hearing officer Sienko was required to render his final deci-

sion no later than August 12, 2002. In fact, the Parents were part of a class action brought to enforce the forty-five day rule in New York. *See Engwiller v. Pine Plains Cent. Sch. Dist.*, 199 F.R.D. 127 (S.D.N.Y.2001).

4. Pursuant to N.Y.C.R.R. § 200.5(j)(2), an SRO must render a final decision on appeal no more than thirty days after the receipt of request for a review. *See* N.Y. COMP. CODES R.

SRO concluded that hearing officer Sienko should not have granted reimbursement for the 1999–2000 school year because the Parents' claim with respect to that year was not raised in a timely manner. (SRO Dec. No. 02–101 at 4.) The SRO applied a one-year statute of limitations and found that the Parents' claim had accrued more than one and one-half years prior to their request for an impartial hearing. (*Id.* at 4–5.) The SRO found that the Parents' claim for 1999–2000 was also barred by the equitable doctrine of laches because the length of their delay was unreasonable and they had provided no reasonable explanation for the delay. (*Id.* at 5.) However, the SRO upheld hearing officer Sienko's determination that Kildonan was S.O.'s appropriate placement for the 2000–01 school year and found that the Parents' claim for tuition reimbursement for 2000–01 was timely and not barred by the equitable doctrine of laches because it was brought within the one-year statute of limitations. (*Id.*) The SRO concluded that hearing officer Sienko was correct to decline consideration of the Parents' claim for the 2001–02 school year because there was "nothing in the record to suggest that they had requested a hearing" relative to that year. (*Id.* at 6.) This SRO decision was not appealed by either the District or the Parents.

On December 11, 2003, the same SRO rendered his decision on the Parents' appeal of the Wanderman decision. In Decision No. 03–052, the SRO disagreed with hearing officer Wanderman and found that there was sufficient evidence of S.O.'s progress at Kildonan, and therefore, the Parents had satisfied their burden of proving that the program at Kildonan met S.O's educational needs during the 2001–02 school year. (SRO Dec. No. 03–052 at 3.) Regarding whether or not equitable con-

siderations supported the Parents' claim for the 2001–02 school year, the SRO concluded that the Parents had cooperated with the CSE and promptly communicated their disagreement with the proposed IEP. (*Id.*) Accordingly, the SRO ordered that the District reimburse the Parents for S.O.'s tuition at Kildonan during the 2001–02 school year. (*Id.* at 4.) The District's Complaint in the present action followed shortly thereafter.

## DISCUSSION

### I. *Substance of the IDEA*

Congress enacted the IDEA to promote the education of children with disabilities. *See, e.g., Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998). The IDEA "provides federal funds to those states that develop plans to assure 'all children with disabilities the right to a free appropriate public education.'" *Id.* (quoting 20 U.S.C. § 1412(1)). "The 'free appropriate public education' mandated by federal law must include 'special education and related services' tailored to meet the unique needs of a particular child, ... and be 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting 20 U.S.C. § 1401(a)(18); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (citations omitted).

The IDEA expresses a strong preference for the educational mainstreaming of children with disabilities "'to the maximum extent appropriate,'" and therefore "special education and related services must be provided in the least restrictive setting consistent with a child's needs." *Rowley*, 458 U.S. at 202–03, 102 S.Ct. 3034 (quoting 20 U.S.C. § 1412(5)); *see also*

& Regs. tit. 8, § 200.5(j)(2); *see also* 34 C.F.R. § 300.511(b).

*Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir.2003). Nevertheless, the IDEA permits education in more segregated settings such as dedicated special education classrooms, the home, hospitals and private institutions " 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.' " *Walczak*, 142 F.3d at 122 (quoting 20 U.S.C. § 1401(a)(16)). If a "state receiving IDEA funding fails to give a disabled child a FAPE [free appropriate public education], the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2d Cir.2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001).

Under the IDEA, "[t]he particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written IEP." *Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1414(a)(5)). The IEP is to be developed by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Id.* (citing 20 U.S.C. § 1401(a)(20)). An IEP must state: (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

*Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1401(a)(20)).

New York has elected to meet its IDEA obligations by "assign[ing] responsibility for developing appropriate IEPs to local [CSEs], the members of which are appointed by school boards or the trustees of school districts." *Walczak*, 142 F.3d at 123 (citing N.Y. EDUC. LAW § 4402(1)(b)(1)). New York's education regulations appear to track the IDEA closely. "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics; (2) social development; (3) physical development; and (4) managerial or behavioral needs." *Id.* (citing N.Y. COMP. CODES R. & REGS. tit. 8 § 200.1(kk)(2)(i)).

■ Parents who are ultimately dissatisfied with an IEP may request, pursuant to IDEA-mandated procedures, a hearing to be held before a school board appointed IHO. *M.S. ex rel. S.S.*, 231 F.3d at 100 (discussing 20 U.S.C. § 1415(b)(2) and N.Y. EDUC. LAW § 4404(1)). At this hearing and throughout the subsequent administrative and judicial appeals process, the school district bears the burden of proving by a preponderance of the evidence that: (1) it complied with IDEA procedural requirements; and (2) the IEP is " 'reasonably calculated' to confer 'educational benefits' " on the student. *M.S. ex rel. S.S.*, 231 F.3d at 102 (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). The nonprevailing party may appeal the IHO's decision to a SRO at the Office of State Review. N.Y. EDUC. LAW § 4404(2). A party dissatisfied with a decision of the SRO may appeal from that determination either by filing an Article 78 proceeding in

New York State Supreme Court or by bringing an action in the appropriate federal district court. *Id.* § 4404(3); *see also Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.,* 281 F.Supp.2d 710, 713 (S.D.N.Y.2003).

## II. *Preliminary Issues*

To begin, it should be noted that neither the inappropriateness of the 2001–02 IEP [5] nor the SRO's conclusion that Kildonan's 2001–02 program was the appropriate placement is at issue before this Court. If either were, we would engage in a two-part inquiry, involving first, whether the state has complied with IDEA procedures, and if so, whether "the individualized education program ... is reasonably calculated to enable the child to receive educational benefits." *Grim,* 346 F.3d at 381 (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034 (footnote omitted)).[6] If we were to agree with the SRO that the IEP was inadequate, we would then consider whether the private program at Kildonan was appropriate. *See M.S. ex rel, S.S.,* 231 F.3d at 104 (stating that once it is determined that an IEP is inappropriate, the burden shifts to the parents to prove that their selection of a private school program is appropriate).

■ However, in support of the present motion the District contends that the SRO erred as a matter of law in granting the Parents tuition reimbursement for the 2001–02 school year on the basis that, in doing so, he failed to apply the one-year statute of limitations recognized by the SRO as applicable to the Parents' commencement of the first administrative proceeding under the IDEA in the December 10, 2003 decision.[7] (Pl. Reply Mem. at 1.; SRO Dec. No. 02–101 at 4.) The District also contends that collateral estoppel precludes defendants from arguing that they had timely filed a request for an impartial hearing concerning the 2001–02 school year. (Pl. Reply Mem. at 1.) However, because we find that the Parents are entitled to tuition reimbursement for the 2001–2 school year under the IDEA's "pendency provision," and for the reasons set forth below, we find it unnecessary to reach the statute of limitations and collateral estoppel issues herein.

## III. *Pendency Placement*

■ The IDEA's "pendency provision," [8] 20 U.S.C. § 1415(j), "provides, inter alia, that 'during the pendency of any proceeding conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child.'" *Mackey v. Bd. of Educ. for the Arlington Cent. Sch. Dist.,* 386 F.3d 158 (2d Cir.2004)

---

5. At the Wanderman hearing the District conceded that the 2001–02 IEP was not appropriate because the state failed to comply with the procedural requirements set forth in the IDEA. (Hr'g Tr. 26–7, 58.)

6. The school district bears the burden of satisfying both prongs of this inquiry by a preponderance of the evidence. *M.S. ex rel, S.S.,* 231 F.3d at 103.

7. We note that Congress has not provided an express statute of limitations prescribing the time within which parents must assert claims

pursuant to the IDEA. *Phillips ex rel. Phillips v. Bd. of Educ. of the Hendrick Hudson Sch. Dist.,* 949 F.Supp. 1108, 1112 (S.D.N.Y.1997). "Where a federal statute is silent with respect to the applicable limitations period, courts apply the 'most appropriate or analogous state statute of limitations.'" *M.D. v. Southington Bd. of Educ.,* 334 F.3d 217 (2003) (quoting *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)).

8. Also referred to as the "stay-put provision."

(quoting 20 U.S.C. § 1415(j)).[9] The Second Circuit has explained that under this provision,

> the inquiry focuses on [first] identifying the then current educational placement, and ... [second] on who should pay for it, for implicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by the Act [IDEA].

*Mackey*, 386 F.3d at 163 (quoting *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir.1982) (internal quotations omitted)).[10] Under the IDEA's "pendency provision," parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local officials, do so at their own financial risk." *Sch. Comm. of the Town of Burlington Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (hereinafter, "*Burlington*").

■ According to the federal and state regulations, a "child's current educational placement may be changed upon agreement between the parents and the state, and an SRO decision that 'agrees with the parents that a change of placement is appropriate ... must be treated as such an agreement.'" *Mackey*, 386 F.3d at 163 (citing 34 C.F.R. § 300.514(a) and (c)). Thus, "once the parents' challenge [to a proposed IEP] succeeds ..., consent to the private placement is implied by law, and the requirements of § 1415(j) become the responsibility of the school district." *Bd. of Educ. v. Schutz*, 290 F.3d 476, 484 (2d Cir.2002). Therefore, pursuant to § 1415(j) of the IDEA, there are only two ways that a child's placement can be changed from public school to a private program: (1) by further agreement of the parents and the school district, or (2) by a decision of an SRO. *See Mackey*, 386 F.3d at 163.

■ In response to the District's motion, the Parents contend that regardless of the issues advanced by the District, they are entitled to tuition reimbursement for the 2001–02 school year as a matter of law pursuant to the IDEA's "pendency provision" as a result of the December 10, 2003 SRO decision. (Defs. Mem. Opp. Mot. Jdgmt. Upon Admin. Rec. at 8.) Specifically, the Parents maintain that the SRO's determination that Kildonan was the appropriate placement for S.O. during the 2000–01 school year constituted an agreement with the State to change her placement to Kildonan. (*Id.*) Therefore, the Parents contend that the legal impact of the December 10, 2003 SRO decision was to define Kildonan as S.O.'s pendency

---

9. New York has a similar pendency rule. The regulation is entitled "Child's status during proceedings," and provides in pertinent part: "(a) [d]uring the pendency of any administrative or judicial proceeding ..., unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement." 34 C.F.R. § 300.514(a) (2004).

10. The IDEA does not define the term "then-current educational placement" and the Second Circuit has not directly considered its meaning. *Mackey*, 386 F.3d at 163. However, other circuits have interpreted the term "then-current educational placement" to mean: "(1) typically the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time ... when the ... [pendency provision] of the IDEA was invoked; and (3) the placement at the time of the previously implemented IEP." *Id.* (internal citations and quotations omitted).

placement from the 2000–01 school year forward unless and until a subsequent legal change occurred. (*Id.*) The District does not dispute that by operation of law the December 10, 2003 decision defined Kildonan as S.O.'s pendency placement. (Pl. Reply Mem. Supp. Mot. Judgmt. Upon Admin. Rec. at 3.) What is in dispute, however, is the effect that placement should be given when the SRO's decision was rendered more than one year after the 2001–02 school year had ended. Plaintiff argues that the December 10, 2003 SRO decision and the change in placement resulting therefrom applies only to the time period following the decision, and does not apply retroactively to affect periods prior to the decision.[11] We disagree.

In *Mackey*, a case which involved facts quite similar to those in the case at bar, the Second Circuit recently concluded that an SRO decision changing a child's placement from public to private school may be retroactively applied in certain situations. *Mackey*, 386 F.3d at 165. More specifically, the court found that an SRO's decision approving a private program as appropriate for "school year one," which was rendered untimely and months after "school year two" had ended, may be retroactively applied to hold the school district responsible for the child's private school tuition for "school year two" under the IDEA's "pendency provision." *Id.* In *Mackey*, the plaintiff parents argued, not unlike the defendant Parents herein, that the "IDEA's pendency provisions and the 'equitable considerations' flowing therefrom" required the school district to assume financial responsibility for their child's private placement throughout the second year.[12] *Id.* at 164.

The district court agreed with the school district and ruled that because the SRO decision effecting the change in placement was rendered after the second school year had ended it could not serve as grounds to award the parents tuition reimbursement based on pendency. *Id.; see also Mackey v. Bd. of Educ. for the Arlington Cent. Sch. Dist.*, 2003 U.S. Dist. LEXIS 13712 (August 1, 2003). However, on appeal the Second Circuit ruled that the district court had "essentially nullified the effect" of the SRO's decision, thereby allowing the school district to "escape the financial consequences of pendency placement for which the District otherwise would have been responsible" and that "such an outcome, if permitted to stand, is unfair to the parents." *Id.* at 164–65.

In arriving at its conclusion, the *Mackey* court relied heavily on the equitable authority granted to it by the IDEA, as well as the Supreme Court's recognition of the role that such authority is to play when

---

**11.** Plaintiff argues that if the first SRO decision were meant to be applied retroactively, the SRO would have affirmed defendants' entitlement to tuition reimbursement for the 2001–02 school year in the December 10, 2003 decision upon his holding therein that S.O.'s placement at Kildonan was appropriate for the 2000–01 school year. However, plaintiff has confused the concept of pendent placement with what is ultimately determined to be the appropriate placement for the 2001–02 school year. Pendent placement "is an entirely independent determination based on the last agreed upon placement." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 86 F.Supp.2d 354, 359 (S.D.N.Y.2000) (quoting

*Matthew K. v. Parkland School District*, 1998 WL 84009, 1998 U.S. Dist. LEXIS 2024, *20 n. 9 (E.D.Pa.1998)). Accordingly, whether the Parents are entitled to tuition reimbursement for 2001–02 based on pendency is completely independent from whether their claim for reimbursement for that same year succeeds on the merits. *Mackey*, 386 F.3d at 160.

**12.** As in the case at bar, the parents in *Mackey* also sued the state because the IHO and SRO had not complied with state timeliness regulations in issuing decisions.

fashioning relief pursuant to the IDEA. *Id.* at 165; *see also Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (observing that the IDEA grants equitable authority to the courts in resolving cases). The language " 'such relief as the court determines is appropriate,' " as set forth in 20 U.S.C. § 1415(i)(2)(B)(iii), " 'means that equitable considerations are relevant in fashioning relief.' " *Id.* (quoting *Burlington,* 471 U.S. at 374, 105 S.Ct. 1996).[13]

Turning back to the case at bar, it is clear and undisputed that the December 10, 2003 SRO decision constituted an agreement between the Parents and the District changing S.O.'s placement to Kildonan. We find the reasoning expressed by the Second Circuit in *Mackey* instructive and now conclude that retroactive application of the December 10, 2003 SRO decision is appropriate in the present case.[14]

If retroactive application of an SRO decision were not available in certain appropriate situations, the IDEA's "pendency provision" would be rendered meaningless. *Murphy,* 86 F.Supp.2d at 367. Parents who disagree with an IEP and take the

risk of unilaterally placing their child in a private program by advancing those costs, must be able to rely on the fact that if an SRO or court ultimately agrees that their choice is appropriate, their decision will be vindicated and their tuition costs will be reimbursed. *Id.* at 365–66 (quoting *Susquenita Sch. Dist. v. Raelee S.,* 96 F.3d 78, 86–7 (3d Cir.1996) ("While parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position.")); *see also Bd. of Educ. of Oak Park & River Forest High School Dist. No. 200 v. Illinois State Bd. of Educ.,* 10 F.Supp.2d 971, 977 (N.D.Ill.1998) (hereinafter *"Oak Park"*) *cert. denied, vacated in part on other grounds by Bd. of Educ. of Oak Park v. Kelly E. ex rel. Nancy E.,* 207 F.3d 931 (7th Cir.1999) ("To hold otherwise would mean that parents who could not afford a private placement would be forced to maintain their child in a public placement that an administrative decision held to be inappropriate."). "The purpose of the . . . [IDEA], which is to ensure that

---

**13.** The *Mackey* court also relied on the Supreme Court's recognition that "review of an IEP is a 'ponderous' process and that a 'final judicial decision on the merits' would 'in most instances come a year or more after the school term covered by that IEP has passed.' " *Id.* (quoting *Burlington,* 471 U.S. at 370–71, 105 S.Ct. 1996). The *Mackey* court noted that in *Burlington* the claim for retroactive reimbursement was based on the merits of the parents' claim (i.e., because the IEP was inadequate and the private placement was appropriate), rather than on pendency, but concluded that the same rationale applied in both situations the "parents were due reimbursement that had been denied them by the simple passage of time." *Id.* at 165.

**14.** We recognize that the circumstances in *Mackey* differ to some extent from those in the

present case, in that a shorter time period was involved. *See Mackey,* 386 F.3d at 164 (noting that if the SRO decision had been timely, the private school would have been found to be the student's pendency placement from December 9, 2000 forward and the parents would have been entitled to tuition reimbursement on a pendency basis for at least part of the 2000–01 school year). However, here the first hearing covered more than one school year, and there were delays throughout the entire process, specifically: (1) it took four months to commence the hearing, and once it had begun it took another eight months to complete; (2) IHO Sienko's decision was more than one month late; and (3) the resulting SRO decision was more than one year late. Accordingly, we conclude that the same policy considerations at issue in *Mackey* should also apply here.

every child receive a 'free and appropriate education' is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education." *Murphy,* 86 F.Supp.2d at 359 (quoting *Susquenita,* 96 F.3d at 86–87). Conversely, the state must also be confident that it will not be liable for tuition costs resulting from a child's unilateral placement in a private program if the SRO or court agrees with the CSE that the public school program was appropriate. Additionally, we believe that if unjustified and unreasonable delays in the state review process, which have become an increasing problem, are tolerated by the courts, school districts and the state will have a strong incentive "to delay administrative decisions as a means of deferring, or worse yet, avoiding financial responsibility." *Murphy,* 86 F.Supp.2d at 367.

■ Furthermore, we note that when fashioning relief pursuant to the IDEA, it is proper for courts to take into account relevant equitable considerations. *See* 20 U.S.C. § 1415(i)(2)(B)(iii); *see also Burlington* (noting that the language, " 'such relief as the court determines is appropriate,' " as set forth in the IDEA "means that equitable considerations are relevant in fashioning relief"). Accordingly, our consideration of the state's unreasonable delay in the review process has properly played an important role in our conclusions herein.

Kildonan became S.O.'s appropriate placement at the start of the 2000–01 school year because, as a result of the first SRO decision, it was at that point that the Parents were no longer in violation of the IDEA's "pendency provision" and their placement of S.O. at Kildonan was no longer unilateral. Consequently, the District became financially responsible for S.O.'s tuition at Kildonan on a pendency basis from the 2000–01 school year forward unless and until a subsequent change in placement occurred. We are unaware of any subsequent change in S.O.'s placement, and in any case, the Parents are entitled to tuition reimbursement at least through December of 2003, which is when both the first and second SRO decisions were rendered and which encompasses the 2001–02 school year.

In other words, the Parents are entitled to tuition reimbursement on a pendency basis regardless of the merit of their 2001–02 claim because pendency placement and appropriate placement are separate and distinct concepts. *Mackey,* 386 F.3d at 162–62 ("A claim for tuition reimbursement pursuant to the stay-put provision is evaluated independently from the evaluation of a claim for tuition reimbursement pursuant to the inadequacy of an IEP."). The IDEA's "pendency provision" represents "Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Mackey,* 386 F.3d at 161 (quoting *Susquenita,* 96 F.3d at 83); *see also Schutz,* 290 F.3d at 484. Therefore, because we have concluded that the December 10, 2003 SRO decision should be retroactively applied to change S.O.'s pendency placement to Kildonan as of the 2000–01 school year, even if we were to agree with the District and determine that the Parents claim for 2001–02 tuition reimbursement should have been barred by a one-year statute of limitations, the Parents would still be entitled to tuition reimbursement for the 2001–02 school year based on pendency alone.

Accordingly, because we conclude that the Parents are entitled to tuition reimbursement for the 2001–02 school year pursuant to the IDEA's "pendency provi-

sion," we deny plaintiff's Motion for Judgment Upon the Administrative Record and dismiss the Complaint as moot.

## CONCLUSION

For the foregoing reasons, plaintiff's Motion for Judgment Upon the Administrative Record is denied. The action is dismissed with prejudice, but without costs or attorneys' fees.

SO ORDERED